Michael Halberstam
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 West 6th Street, Suite 400
Cleveland, OH 44113
Phone: (216) 578-1700
Facsimile: (216) 578-1800
E-mail:  Michael.Halberstam@ChandraLaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

| | | |
|---|---|---|
| PATRICK FORAN, TOMMY ALSTON, MICHAEL ARMITAGE, JOSEPH DOORLEY, THOMAS MALECEK, DAG SOHLBERG, | : : : : | ECF<br>18 Civ. 10857 |
| Plaintiffs, | : | **COMPLAINT** |
| - against - | : : | **DEMAND FOR JURY TRIAL** |
| THE NATIONAL FOOTBALL LEAGUE, INC., THE NFL EMPLOYEE RECIPROCAL FLEXIBLE BENEFITS PLAN, THE NATIONAL FOOTBALL LEAGUE CAPITAL ACCUMULATION PLAN, THE NFL PENSION PLAN, and other to-be named JOHN DOE ENTITIES 1 – 10, whose true names are unknown, | : : : : : : | |
| Defendants. | | |

------------------------------------------------------------------ X

Plaintiffs PATRICK FORAN, TOMMY ALSTON, MICHAEL ARMITAGE, JOSEPH
DOORLEY, THOMAS MALECEK, and DAG SOHLBERG, by their attorneys The Chandra
Law Firm LLC, submit this Complaint against Defendants THE NATIONAL FOOTBALL
LEAGUE, INC., THE NFL EMPLOYEE RECIPROCAL FLEXIBLE BENEFITS PLAN,
THE NATIONAL FOOTBALL LEAGUE CAPITAL ACCUMULATION PLAN, THE NFL
PENSION PLAN, along with other to-be named JOHN DOE ENTITIES 1 – 10, whose true
names are unknown, alleging as follows:

**NATURE OF THE ACTION**

1.      Plaintiffs in this action are former security specialists, who were retained by the Defendant National Football League, Inc. ["NFL"] to provide security services for the NFL Security Department.

2.      Each Plaintiff worked for the NFL for at least 12 years.  Some worked for the NFL for as long as 26 years.

3.      Plaintiffs were referred to as "Security Representatives" for the NFL, charged with ensuring that the NFL's rules, security procedures, and security protocols were implemented by the NFL member teams across the country.

4.      Defendant NFL intentionally misclassified Plaintiff Security Representatives as "independent contractors," thus denying Plaintiffs overtime wages, reimbursement of certain expenses, employee pension-and-welfare benefits, and other rights and privileges to which they were entitled as employees.

5.      Plaintiffs seek a declaratory judgment that, at all times while retained by the NFL, they were employees of the NFL. Plaintiffs also seek recovery of (1) unpaid wages for overtime hours worked under the Federal Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 et seq. (the "FLSA"), and under other relevant state-law employee wage-and-hour protections identified below; (ii) pension-and-welfare benefits to which Plaintiffs were entitled but did not receive as a result of Defendants' misclassification of Plaintiffs as independent contractors, under § 502 of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132; and (iii) compensatory damages, liquidated damages, punitive damages, attorneys' fees, costs, and prejudgment interest.

6.      Plaintiffs further assert that Defendant NFL discriminated against Plaintiffs with the purpose of interfering with Plaintiffs' rights to employee benefits, violating ERISA § 510, 29 U.S.C. § 1140.

7.      As a direct and proximate result of the NFL's misclassification, Plaintiffs also overpaid on their federal taxes and did not receive the benefit of their employer's required contributions to Social Security and Medicare taxes under FICA.

8.      Plaintiffs therefore also assert common-law claims of unjust enrichment regarding the Security Representatives' overpayment of federal taxes, and Defendant NFL's avoidance of its legal obligation to pay its share of employee Social Security and Medicare taxes, respectively.

9.      Plaintiffs also assert common-law claims of unjust enrichment regarding any costs the Defendant NFL saved by denying Plaintiff Security Representatives those employee pension and welfare benefits to which they were entitled.

10.     Defendant NFL's misclassification of the NFL Security Representatives also denied Plaintiffs certain other statutory employee rights under federal, state, and local laws, including but not limited to certain rights to notice under federal and state labor laws and ERISA, and certain rights under the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601, *et seq*. for which they now seek relief.

## JURISDICTION AND VENUE

11.     The Court has subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331, and under the FLSA (29 U.S.C § 216), under ERISA (29 U.S.C. § 1332(e)), and under the FMLA (29 U.S.C. § 2617). The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

12.     Venue is proper in this district under 28 U.S.C. §1391(b)(1) because all Defendants reside in this district.

**THE PARTIES**

**Plaintiffs**

### Patrick Foran

13.     Plaintiff Patrick Foran resides in Bay Village, Ohio.

14.     He was a Special Agent (SA) with the Federal Bureau of Investigation for 29 years before he joined the NFL. He worked in the field for seven years around the country, and was then promoted to a Field Supervisory Special Agent in Cleveland for the next three years. In that position, he led a task force that succeeded in indicting and evicting all members of the principal organized crime "family" (Cosa Nostra) in northern Ohio for murder, arson, bribery, and RICO violations.  He then moved to FBI headquarters in Washington, D.C. to join the Criminal Investigative Division as a Supervisory Special Agent (SSA). Following an assignment to the Law Vegas office, he was transferred to the FBI Academy in Quantico, Virginia, where he helped develop and implement FBI training programs.  He returned to FBI Headquarters to become Chief of the Intelligence Unit within the FBI's Criminal Investigative Division. He retired from the FBI in 1999, as a Section Chief and Acting Deputy Assistant Director in the Administrative Services Division.

15.     Beginning in 2001, Foran was employed by the NFL for 17 years—first as an Associate Security Representative for five years, then for over 10 years as a Security Representative, until his termination in August 2018. He was assigned to the Cleveland Browns at the First Energy Stadium in Cleveland, Ohio. In addition to working Game Days during the regular season, Foran, at the NFL's direction, worked at numerous NFL Events, including Madden Launches, 17 Pro Football Annual Hall of Fame Games and Enshrinements, four Rookie Symposiums, three Annual NFL Drafts, and four NFL Super Bowls. Foran worked for

the NFL Security Department on NFL investigations, game security audits, stadium-security inspections, and other matters across the country throughout his employment.

16.     Foran's most recent contract with the NFL expired on July 31, 2018.

**Tommy Alston**

17.     Plaintiff Tommy Alston resides in Canton, Michigan.

18.     He is a 34-year veteran of the City of Detroit Police Department, where he has held positions as commanding officer of Homicide and inspector in Field Duty Operations. Subsequently, he worked as the chief investigator at the Wayne County Medical Examiner's Office in Detroit, Michigan.

19.     Beginning in 1997, Alston was employed by the NFL for 20 years—first as an Associate Security Representative, then as a Security Representatives for 19 years. Alston was assigned to the Detroit Lions at Ford Field in Detroit, Michigan. In addition to working Game Days during the regular season, Alston, at the NFL's direction, worked at numerous NFL Events throughout his time as a Security Representative, including four Super Bowls and the NLF Draft. Alston worked for the NFL Security Department on NFL investigations, game security audits, stadium-security inspections, and other matters across the country throughout his NFL employment.

20.     Alston's most recent contract with the NFL expired on March 31, 2016.

**Michael Armitage**

21.     Plaintiff Michael Armitage resides in Milwaukee, Wisconsin.

22.     He worked for the FBI for nine years before he joined the NFL.

23.     Armitage was employed by the NFL for a total of 26 years. In 1990, he began working for the NFL as the Security Representative assigned to the Green Bay Packers in Milwaukee. When the Green Bay Packers moved to Green Bay around 1994/95, Armitage did

not at first follow. But in 1996, he was rehired to be the Security Representative for the Green

Bay Packers at Lambeau Field in Green Bay, Wisconsin. He remained in that position until

August 2017. In addition to working Game Days during the regular season, Armitage, at the

NFL's direction, worked at numerous NFL Events throughout his time as a Security

Representative, including Super Bowls and Pro Bowls, and Championship games. Armitage

worked for the NFL Security Department on NFL investigations, game security audits, stadium-

security inspections, and other matters across the country throughout his NFL employment.

24.     Armitage's most recent contract with the NFL expired on March 31, 2018.

**Joseph Doorley**

25.     Plaintiff Joseph Doorley resides in Chicago, IL.

26.     He worked for the FBI for over 30 years before he joined the NFL. He retired

from his position as managing supervisor of the Violent Crimes Task Squad with the FBI in

Chicago in July 2006.

27.     Beginning in August 2006, Doorley was employed by the NFL for a total of 12

years, first as an Assistant Security Representative for three years, then as a Security

Representative for eight years. Doorley was assigned to the Chicago Bears at Soldier Field in

Chicago, Illinois. In addition to working Game Days during the regular season, Doorley, at the

NFL's direction, worked at numerous NFL Events, including the Madden Launch and two NFL

drafts. Doorley worked for the NFL Security Department on NFL investigations, game security

audits, stadium-security inspections, and other matters across the country throughout his NFL

employment.

28.     Doorley's most recent contract with the NFL expired in March 2016.

**Thomas Malecek**

29.     Plaintiff Thomas Malecek residents in the City of Town and Country, Missouri.

30.     He worked for the St. Louis Police Department for 28 years before he joined the NFL. He moved up the ranks from police officer to detective, sergeant, lieutenant watch commander, and commander (both of the Juvenile Division, and the Hostage Response Unit). For his work he received numerous commendations, awards, and honors from the police department, the St. Louis Board of Education, and the City. He retired from the St. Louis Police Department in 1994.

31.     Beginning in 1995, Malecek was employed by the NFL for 21years, first as an Associate Security Representative for 16 years, then as a Security Representative for four years. Malecek was assigned to the St. Louis Rams at the Edward Jones Down in St. Louis, Missouri. In addition to working Game Days during the regular season, Malecek, at the NFL's direction, worked at several NFL Events. Malecek worked for the NFL Security Department on NFL investigations, game security audits, stadium-security inspections, and other matters.

32.     Malecek's most recent contract with the NFL expired in December 2016.

**Dag Sohlberg**

33.     Plaintiff Dag Sohlberg resides in Apple Valley, Minnesota.

34.     He worked for the FBI in Minneapolis for over 25 years before he joined the NFL—first as a Special Agent, then as a Supervisory Special Agent. In 1998, he served as a Special Investigator in the Interior Department's Office of the Special Counsel.

35.     Beginning in 1999, Sohlberg was employed as a Security Representative by the NFL, for 19 years. Sohlberg was assigned to the Minnesota Vikings. In addition to working Game Days during the regular season, Sohlberg, at the NFL's direction, worked at numerous NFL Events, including Super Bowls and Pro Bowls. Sohlberg worked for the NFL Security

Department on NFL investigations, game security audits, stadium-security inspections, and other matters across the country throughout his NFL employment.

36.    Sohlberg's most recent contract with the NFL expired on March 31, 2018.

**Defendants**

37.    Defendant NFL is a professional American football league with its corporate offices headquartered at 345 Park Avenue, New York, New York 10065. The NFL consists of 32 franchises (member teams), each of which appoints one member to the NFL's board. The NFL's day-to-day operation is handled by an appointed commissioner, currently Roger Goodell. On information and belief, the NFL employs more than 1900 employees.

38.    Upon information and belief, The NFL Employee Reciprocal Flexible Benefits Plan, The National Football League Capital Accumulation Plan, and The NFL Pension Plan are NFL-sponsored "employee benefit plans" as defined by ERISA § 3, 29 U.S.C. § 1002.

39.    Also named as defendants are John Doe Entities 1 through 10, whose true names are unknown. These defendants are limited to all those NFL-sponsored employee-benefit plans whose names are, as of the filing of this Complaint, still unknown to Plaintiffs. This information is in Defendants' possession and is not readily available public information. Plaintiffs have filed a Freedom of Information Act request with the Department of Labor's Employee Benefits Division, but have, as of this Complaint's filing, received no relevant response. Moreover, in the past, the NFL has failed to comply with ERISA requirements that a summary plan description be filed for every ERISA plan. Plaintiffs do not know whether the NFL is currently in compliance with relevant filing requirements.

## FACTS

**The Duties of an NFL Security Representative.**

40.     Plaintiffs Foran, Alston, Armitage, Doorley, Sohlberg, and Malecek each was employed by the NFL as a Security Representative. Their respective tenures with the NFL range from 12 to 26 years.

41.     Football stadium security is multilayered. The stadiums and member teams each have their own dedicated security staff, which does not work for, or report to, the NFL.

42.     The NFL hires its own security professionals, who report to the NFL's Security Department in New York City.

43.     The NFL hires and assigns one NFL Security Representative to each of the 32 member teams. (An additional two Security Representatives are hired—one in Las Vegas and one in Honolulu—but are not assigned to teams and primarily provide investigative services to the NFL.)

44.     The NFL additionally relies on approximately 32 Associate Security Representatives to assist the Security Representatives.

45.     The NFL's Security Representatives represent the NFL's interests around the country. They ensure that the NFL's rules, security procedures, and security protocols are observed by all NFL employees, member teams (and their employees), the stadiums in which games are played, game officials, and players.

46.     In so doing, the Security Representatives also serve as the League's liaisons to local law enforcement and first responders.

47.     The Security Representatives are the "eyes and ears of the NFL" on the field and in the stadium, taking direction from, and reporting back to, the NFL's Security Department at the League headquarters in New York City.

48.     In addition, the NFL's Security Representatives perform (1) pre-employment background checks, (2) confidential internal investigations upon requests received from NFL players and employees regarding contemplated investments and hiring of employees, (3) criminal- and personal-conduct-violation investigations relating to NFL players and employees, (4) NFL Best Practices stadium-security inspections, (5) personal- or home-security services for players and NFL personnel, and (6) prescription-drug audits—all upon request by, under the supervision of, and according to the highly detailed direction of, the NFL's Security Department in New York City.

49.     Finally, the Security Representatives are also assigned to work on NFL Events, such as the Super Bowl, Pro Bowl games, Championship games, the NFL Draft, and others.

50.     The security work performed by the Security Representatives (and the Associate Security Representatives) is essential to the NFL's operations.

51.     The NFL season format consists of a four-week preseason; a 17-week regular season; and a 12-team, and a single-elimination playoff season culminating in the Super Bowl.

52.     During football season the Security Representatives have "Game Day" responsibilities at their assigned team's home stadium.

53.     The NFL instructs Security Representatives to arrive on game days at the stadium several hours before kickoff, and does not permit them to leave the stadium until all the officials and visiting team's buses are off the premises, after which they meet with stadium-security personnel to gather statistics regarding arrests, ejections, weapons, bags checked, and other notable incidents or events that may have occurred during the game. All information obtained must be forwarded to the NFL Security Department in New York City.

54.     The "NFL Security Representative Operations Manual," NFL policies, and a "Game Day Operations Check List" specify the tasks that the Security Representatives are

required to perform on Game Days, and they also dictate the way in which the Security Representatives are required to perform them.

55.      Preparation for Game Days begins during the week before each home game. Under the "NFL Security Representative Operations Manual" and "NFL Game Day Operations Check List," Security Representatives' game-day duties included, but were not limited to

a.      contacting the visiting team's director of security or designated individual to obtain their travel itinerary, lodging location, times of flight arrival/departure, schedules while within the location, and other information regarding their visit;

b.      contacting game-day officials regarding their travel schedules and lodging;

c.      facilitating the arrival, security, and departure of game-day officials as well as visiting teams and their owners;

d.       inspecting both teams' locker rooms for safety;

e.      monitoring the arrival of game footballs, and witnessing, participating in, and recording the results of, inflation of game footballs;

f.      meeting with local, state, and federal law enforcement regarding any known or perceived threats to the stadium;

g.       meeting with stadium-security personnel regarding staffing at security posts;

h.       meeting with K-9 personnel for assignments;

i.      accounting for assigned portable radios via sign-in sheet;

j.      facilitating and conducting 100-minute security meetings with game-day officials, local, state, and federal law enforcement, stadium-security personnel,

visiting-team security personnel, and home-team security personnel, to review evacuation procedures and stoppage of games in case of any unusual incident;

k.   observing the conduct of thousands of fans during the game and while departing from the stadium;

l.    ensuring proper deployment of security personnel both inside and outside the stadium;

m.    liaising with local, state, and federal law enforcement;

n.    liaising with stadium personnel, players, coaches, team administrative staff, and team owners (pre- and post-game); and

o.    coordinating the security activities with the NFL's Integrated Operations Center (IOC).

56.    When performing game-day services, the Security Representatives communicate with a command post manned by an NFL supervisor, law-enforcement, fire, and emergency-management personnel who monitor radio communications, CCTV monitors, and telephone communications, and, when necessary, direct law enforcement and stadium-security personnel to handle field matters.

57.    In addition, the NFL Security Department written policies and the "NFL Game Day Operations Check List" require that the Security Representatives prepare a "Game Day Report" right after the game, apprising the NFL's Security Department in New York of the number and nature of any arrests, ejections, weapons, bags checked, and other notable incidents and events that occurred during the game. Security Representatives also must prepare a separate report for their supervisors in New York regarding the results of the "Fair Competition and Ball Inflation Inspection" (explained below). Security Representatives enter all reports directly into

the NFL Case Management System (known as "SARAX"). Security Representatives typically work between 12 and 14 hours on regular Game Days.

58.     The "NFL Security Representative Operations Manual" requires that Security Representatives conduct periodic inspections of all of the football stadiums to ensure compliance with the "NFL Best Practices for Stadium Security."  The Security Representatives are not permitted to conduct security-audit inspections at their own assigned stadiums, but are assigned to conduct security-audit inspections at stadiums assigned to other Security Representatives. The NFL also requires the Security Representatives to conduct a post-inspection briefing and prepare a security-audit inspection report. In conducting stadium-security Inspections, Security Representatives follow a lengthy protocol and checklist the NFL itself provides.

59.     The NFL assigns Security Representatives to conduct "Rx Drug Audits" to verify that the medical staffs of the member clubs were properly accounting for the prescription drugs they were dispensing, and that proper security measures were followed regarding the storage of those drugs.

60.     The NFL assigns Security Representatives to conduct "Fair Competition Inspections," which require that the Security Representatives accept a shipment of electronic-testing equipment, arrange for the safekeeping and delivery of equipment, facilitate the access of the inspectors to the stadium, and escort the inspectors while inside the stadium.

61.     Beyond directing the above-described activities, the NFL assigns several Security Representatives to work on other large NFL events like the Super Bowl and the NFL Draft.

62.     For example, on information and belief, the NFL has assigned up to nine Security Representatives to work on a single Super Bowl. Different Security Representatives from around the country are assigned to take on different responsibilities, such as helping to coordinate the build-out of the stadium, establishing a security perimeter for the stadium, coordinating comings

and goings at the hotel(s) where the teams and the game officials stay during the Super Bowl, and other responsibilities. Such assignments to the Super Bowl site can last as long as four to five weeks leading up to the Super Bowl, plus several days thereafter, during which time Security Representatives may work 90-hour work weeks.

**Defendant NFL misclassified the Security Representatives as independent contractors.**

63.     The NFL typically renewed Plaintiffs' contracts with the NFL every two years during 2014–18, and every year before 2014. Each time Plaintiffs were required to execute the agreements, Defendants misclassified them, and therefore denied them the welfare and pension benefits, and other statutory rights and benefits, to which they were entitled.

64.     Upon information and belief, each Plaintiff has been required to execute a "Security Representative Consulting Agreement" three or four times in the last six years.

65.     The most recent version of the contract was designated "Security Representative Consulting Agreement."

66.     In the "Security Representative Consulting Agreement," the NFL designates the Security Representative as a "consultant" and an "independent contractor."

67.     Plaintiff Security Representatives, however, were neither mere consultants nor independent contractors.

68.     The NFL Security Representatives were in fact longtime NFL employees, with terms ranging from 12 to 26 years.

69.     The NFL currently has, and at all times during Plaintiffs' respective tenures had, the right to direct, control, and supervise the Security Representatives in all aspects of their duties, and in many respects micromanaged its Security Representatives.

70.     The "NFL Security Representative Operations Manual," routinely issued NFL-Security-Department written policies, and the "NFL Game Day Operations Check List" dictate the work the Security Representatives are required to perform on game days and the manner in which the Security Representatives are required to perform the work.

71.     As already stated, on game day, Security Representatives are required to facilitate the arrival, security, and departure of game-day officials, visiting teams and their owners; inspect both teams' locker rooms for safety; monitor the arrival of game footballs; witness, record, and report game-football air pressure; meet with stadium-security personnel regarding staffing at security posts;  meet with K-9 personnel for assignments; account for assigned portable radios via sign-in sheet; facilitate and conduct the "100-minute meeting"; be present at the "90-minute meeting," and more (paras. 43 - 57 *supra*).

72.     The "NFL Security Representative Operations Manual" requires the Security Representatives to conduct stadium-security inspections on game days pursuant to the "NFL Best Practices for Stadium Security", which dictates the manner in which the Security Representatives are required to perform the work.

73.     The NFL dictates that the Security Representatives conduct Ball-Inflation Inspections and the manner in which the Security Representatives are required to perform them. For example, the Security Representative must take possession of the footballs, participate as the game officials check the pressure of each football, make sure the footballs are certified, and then physically take the footballs out to the field before the game.

74.     The NFL requires the Security Representatives to conduct Rx Drug Audits and dictates the manner in which the Security Representatives are required to perform the work.

75.     Security Representatives have little or no autonomy or discretion regarding the manner in which they perform their confidential and/or criminal investigations.

76.     For example, when assigning investigations, the NFL dictates the investigative steps the Security Representatives must take, rather than imbue the Security Representatives with the discretion to choose which steps they believe should be taken to accomplish the investigative goal. The NFL Security Department goes so far as to instruct Security Representatives regarding which witnesses to interview and what questions to ask.

77.     The NFL's "Investigative Manual for Security Representatives" provides that, when a case is opened by a Security Representative, it must be opened in SARAX and approved by the Director of Investigations.

78.     The NFL provides different forms to be completed for different types of investigations.

79.     For cases of conduct violations by NFL players or other team personnel, there is a special notification form that requires the Security Representative to specify any arrest, the circumstances surrounding the arrest, whether any video is available, etc.

80.     The "Investigative Manual for Security Representatives" contains a section regarding "Special Investigations," such as Domestic Violence. In such cases, the manual requires the initial completion of a special form, the close supervision of the investigation by an NFL Director of Investigations, who is to provide specific direction, including who is to be interviewed and when, and what evidence should be obtained.

81.     In all major cases, such as "Tampering Matters," the Director of Investigations provides Security Representatives with leads, specifies who is to be interviewed, what questions are to be asked and what evidence should be gathered.

82.     Invoice billing for work done by a Security Representative must contain a statement that all investigation conducted was approved by a Director of Investigation.

83.     The NFL Security Representatives do not have autonomy in the means and methods of performing their work.

84.     The NFL requires the Security Representatives to participate in training sessions, as and when directed.

85.     The NFL requires Security Representatives to comply with its general policies.

86.     The NFL requires Security Representatives to submit to, and pass, background checks.

87.     The NFL dictates the apparel that the Security Representatives must, and what they cannot, wear when doing NFL business.  The "Dress Code for Security Representatives" reads in part:

> All Security Representatives of the NFL are to dress appropriately and professionally when providing services to the NFL, especially when appearing at games / events, conducting interviews or otherwise representing the Security Department.
>
> Game Day Attire
>
> - Security Representatives working in venues with domes will always wear a jacket and tie (sports coat and slacks or suit).
>
> - In an outdoor stadium, the general rule is for a coat and tie to be worn by Security Representatives during game day operations.  Removal of coats in hot weather is permissible providing the tie is worn.
>
> - For games prior to October 1st, it will be at the discretion of the Security Representative in **severely hot weather only** to wear a dress shirt, no tie, with dress slacks. Especially when not wearing a jacket and tie, shirt and slacks must be of dress quality, shirts must have a collar, light or white in color - no polo shirts allowed.
>
> The basis for this policy stems from the fact that a Security Representative can be photographed or filmed on national television or called into meetings with owners or club executives at any time during a game day.  Further, the discharge of the Security

> Representatives' duties with coaches and players can be aided by professional dress thereby underscoring the authority of the position in those instances where needed.

88.     The NFL dictates the manner in which Security Representatives are required to conduct themselves when doing NFL business.

89.     Security Representatives are subject to the same rules of conduct as NFL employees.

90.     The NFL provides identification cards to the Security Representatives that bear the NFL logo and identify the Security Representatives as representatives of the NFL. Nothing on those cards says "Independent Contractor" or anything of the sort.

91.     The NFL pays for the equipment the Security Representatives use in performing their duties.

92.     The NFL requires that travel be arranged by the NFL's own internal travel department in New York, and determines which hotels the Security Representatives may check into and on which airline carriers they may fly.

93.     The NFL reimburses the Security Representatives for their expenses according to standard NFL employee schedules. Thus not all of the Security Representatives' expenses are covered.

94.     The NFL Security Department expects the Security Representatives to be on call at all times, both day and night.

95.     For example, Security Representatives will get calls late at night to check on NFL players who have been arrested by local law enforcement.

96.     The Security Representatives are NFL employees.

**Defendant NFL engaged in an elaborate scheme to deprive the Security Representatives of wages and employee benefits.**

97.     On information and belief, Defendant NFL engaged in an elaborate scheme to deprive Plaintiffs, and others, of their rightful wages, employee benefits, and statutory rights as employees.

98.     On information and belief, the NFL Security Department comprises over 70 security professionals.

99.     On information and belief, the NFL, at all relevant times, carried only about five or six security professionals on its books as employees.

100.    On information and belief, the Defendants knew that the Security Representatives were employees.

101.    Several members of the NFL's management team acknowledged as much in various private conversations with Security Representatives.

102.    During a private conversation with a Security Representative regarding the status of Security Representatives, one key NFL official stated, "You are employees."

103.    On a separate occasion, a second key NFL official stated in a private conversation with a Security Representative that "There are two things that I'm afraid of. The first is that a bomb will go off in a stadium; the second is that you [the Security Representatives] will sue us as being employees."

104.    Defendants thus knowingly and fraudulently misrepresented to Plaintiffs (and others) that their status was that of an independent contractor, and that they were therefore not entitled to any of the benefits, privileges, or statutory rights of employees.

105.    Notably, this is not the first time that the NFL has misclassified employees as Independent Contractors. In *Richardson v. National Football League, et al*, Docket No.: 1:07-cv-11632, filed in the United States District Court for the Southern District of New York in 2008, plaintiff urine testers sued the NFL for age discrimination in terminating their employment and violations

of the Fair Labor Standards Act. According to the complaint, the plaintiffs had sought and obtained a determination by the United States Internal Revenue Service that the NFL misclassified them as "independent contractors" when, in fact, they were employees. The factors considered by the IRS in determining whether a worker is an independent contractor or employee largely mirror the factors considered by New York courts. After taking some swipes at the complaint on technical grounds, the NFL entered into a confidential settlement agreement with the plaintiffs.

106.    Here too, the Defendant NFL has cheated Plaintiff Security Representatives, and perhaps other misclassified employees, out of wages and other benefits to which they are entitled in violation of the FLSA, ERISA, the FMLA, and the labor laws of Illinois, Michigan, Minnesota, Missouri, Ohio, and Wisconsin.  And, upon further information and belief, the NFL has cheated the United States government and more than one state government out of millions of tax dollars by misclassifying the Security Representatives.

107.    Despite the *Richardson* case, Defendants have not cured their unfair and illegal treatment of employees.

108.    Instead, Defendants engaged in an elaborate scheme to maintain the fiction that the Security Representatives, and others, were independent contractors, when in fact they were employees.

109.    The NFL required Security Representatives to sign contracts that misrepresented their employee status.

110.    On information and belief, the NFL at no time negotiated any aspect of its standard Security Representative agreement with any Security Representative.

111.    On information and belief, the NFL at no time modified any substantive provision in its standard Security Representative agreement in response to a requested change by a Security Representative.

112.    The position of Security Representative for the NFL has been a highly desirable one among former law-enforcement personnel, and working for the NFL—perhaps the premier American sports organization—is associated with extraordinary prestige. On information and belief, when the NFL in the Spring of 2017 put out a "request for proposals" to replace its Security Representatives, over 2,000 persons applied for the Security Representative positions.

113.     For these reasons, the NFL was in a position to present Plaintiff Security Representatives with a take-it-or-leave-it contract providing that they would be treated as independent contractors rather than as the employees they actually were.

114.    On information and belief, the NFL advised Security Representatives to form their own separate LLC entities, so as to promote the fiction that they were independent contractors.

115.    The NFL required each Security Representative to hire an "Associate Security Representative" to avoid hiring Associate Security Representatives as part-time NFL employees and to promote the fiction that Security Representatives were independent contractors.

116.    Associate Security Representatives assisted the Security Representatives, especially in their Game Day activities, and provided critical back-up if a Security Representative was for some reason unable to make it to his job on game day.

117.    The fact that Associate Security Representatives were on call or on site, and could replace a Security Representative on game day at a moment's notice, was critical for the NFL's operations.

118.    Like the Security Representatives, the Associate Security Representatives were typically experienced former law-enforcement professionals.

119.    The Associate Security Representatives helped ensure that the NFL member teams implemented the NFL's rules, security procedures, and security protocols on game days.

120.    Associate Security Representatives worked on site, in the member team's stadiums, and under the direction and close supervision of the Security Representatives, who were NFL employees.

121.    The NFL decided who was hired as an Associate Security Representative, paid the Associate Security Representatives, reimbursed their expenses (based on standard NFL-employee reimbursement), provided them with NFL staff security badges on game days, and subjected them to the same rules of conduct and dress-code requirements as NFL staff.

122.    The common path to become a principal Security Representative was by working, for a time, as an Associate Security Representative.

123.    For many years, Associate Security Representatives submitted their own time sheets and expenses directly to the NFL and were paid directly by the NFL.

124.    The approximately 32 Associate Security Representatives who worked with the Security Representatives were also NFL employees.

125.    On information and belief, shortly after the *Richardson* settlement, the NFL decided to require the Security Representatives to submit the timesheets and expenses for the Associate Security Representative and funneled the pay for each Associate Security Representative through the Security Representative. A check was cut to the Security Representative that included the pay to the Associate Security Representative, which the Security Representative then gave to the Associate Security Representative.

126.    On information and belief, the purpose of this change in procedure was to maintain the fictions that the Security Representatives were independent contractors and that the Associate Security Representatives had no claim to employee benefits or rights against the NFL, and to avoid federal and state taxes, and other employment related costs.

127.    In April of 2017, the NFL Security Department instituted a new process for retaining Security Representatives. The NFL terminated all contracts with Security Representatives and required them to reapply for their jobs by responding to a public request for proposals.

128.    On information and belief, the RFP process had no legitimate business purpose.

129.    On information and belief, many of the hiring decisions the NFL Security Department made through the RFP process utterly failed to apply the requirements and qualifications for a Security Representative position publicly advertised in the RFP.

130.    On information and belief, some of the Security Representatives hired via the RFP process did not carry a state private investigator license and were not authorized to work as private investigators as required by the RFP.

131.    On information and belief, some Security Representatives hired via the RFP process did not have the required professional experience for the position as required by the RFP.

132.    On information and belief, the Security Department did not apply the advertised criteria in making its hiring decisions.

133.    On information and belief, the RFP was intended to promote the fiction that the Security Representatives were independent contractors.

134.    Indeed, the only substantive change made to the Security Representative agreement used in the wake of the RFP was an unenforceable waiver of Plaintiffs' statutory rights

under ERISA which reads as follows: "Even if Consultant or Key Person at any time hereafter becomes, or is adjudged to be, an NFL employee, this rejection of benefits will remain valid and binding."

135. The NFL intentionally misclassified the Security Representatives as independent contractors for the purpose of avoiding federal and state taxes, the costs of employee pension-and-welfare benefits, and other liabilities associated with the Security Representatives' employee status—with full knowledge that such practices are illegal.

136. The NFL denied any contract at all to the Associate Security Representatives.

**Plaintiff Security Representatives were denied wages and employee benefits.**

137. The NFL did not carry Plaintiff Security Representatives (or any of the other approximately 60 additional Security Representatives or Associate Security Representatives) on its books as employees.

138. As a result, Defendant NFL did not pay federal Social Security or Medicare taxes, state unemployment insurance, workers' compensation insurance, or disability insurance for Plaintiffs as required by federal and state law, causing Plaintiffs to overpay on their federal and state taxes.

139. Defendant NFL made repeated false representations to Plaintiffs that they were independent contractors with no rights to employee pension or welfare benefits or any other employee rights.

140. Plaintiff Security Representatives relied on Defendants representations that they were independent contractors.

141.     As a result, Plaintiffs never received, from the NFL, any employee pension or welfare benefits to which, subject to plan-eligibility requirements, they were entitled as employees.

142.     Plaintiffs did not receive paid vacation or sick days, to which they were entitled as employees.

143.     As independent contractors, Plaintiffs could not avail themselves of their employee rights to medical leave, to which under the FMLA they were entitled as employees. In particular, Plaintiffs Alston and Sohlberg chose not to seek renewal of their contracts with the NFL because they were unable to obtain sick leave to which they were entitled as employees.

144.     Most Plaintiffs worked on NFL Events such as Super Bowls, Pro Bowls, NFL Drafts, Madden Launches, and others.

145.     When they did so, Plaintiffs worked more than 40 hours per week, and often as many as 50 (or more) hours of overtime per week.

146.     At no time did the NFL pay the Security Representatives the overtime wages to which they were entitled under federal and state laws.

**Defendants co-administer the NFL employee benefits and breached their fiduciary duties as co-administrators.**

147.     On information and belief, Defendant NFL had several different employee benefit plans.

148.     On information and belief, Defendant NFL's Employee Benefits Committee made determinations as to which employees were eligible for which plan.

149.     On information and belief, the NFL's Employee Benefits Committee was well aware of the intentional misclassification of Plaintiff Security Representatives, and participated in

the NFL's misrepresentations and elaborate scheme to deprive the Security Representatives of wages and employee benefits.

150.    Defendant NFL, by thus failing to apply plan eligibility requirements equally to the Plaintiff Security Representatives, and changing plan eligibility requirements as to Plaintiffs, assumed responsibility as a co-administrator for its benefit plans within the meaning of ERISA § 3, 29 U.S.C. § 1002(16).

151.    As a co-administrator of the NFL plans, the Defendant NFL had certain fiduciary duties under ERISA.

152.    Defendant NFL breached its fiduciary duties by its intentional misclassification of Plaintiff Security Representatives, and by its willful misrepresentations and elaborate scheme to deprive the Security Representatives of their employee rights under ERISA.

## CLAIMS

### Claim 1
### (Violation of the FLSA §§ 201, *et seq.,* against Defendant NFL, by all Plaintiffs)

153.    Plaintiffs repeat and reallege each of the foregoing allegations.

154.    At all relevant times, Defendant NFL was an "employer" engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA § 203(d), 29 U.S.C. § 203(d).

155.    At all relevant times, Defendant NFL "employed" Plaintiffs within the meaning of the FLSA § 203(g).

156.    Plaintiff Security Representatives worked as many as 90 hours (or more) per week during times when they worked on special events, such as Super Bowl games, Pro Bowl games, the NFL Draft, and on other occasions.

157.     Plaintiff Security Representatives were never paid one and one-half times their regular rate of pay when they worked in excess of 40 hours per week for the Defendant NFL.

158.     By failing to pay them one and one-half times their regular rate of pay when they worked in excess of 40 hours per week, the Defendant NFL violated FLSA § 207(a), 29 U.S.C. § 207(a).

159.     Defendant failed to provide Plaintiffs with overtime benefits and other benefits to which they were entitled as a result of Defendant's willful misclassification of Plaintiffs.

160.     Upon information and belief, Defendant also violated the FLSA's recordkeeping requirements.

161.     As a result of Defendant's unlawful conduct, Plaintiffs are entitled to an award of damages under 29 U.S.C. § 216(b) in an amount to be determined at trial, including unpaid benefits, liquidated damages, and costs and attorneys' fees.

**Claim 2**
**(For Recovery of Welfare and Pension Benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), against all Defendants, by all Plaintiffs)**

162.     Plaintiffs repeat and reallege each of the foregoing allegations.

163.     Plaintiffs were at all relevant times employees of the NFL.

164.     As employees of the NFL, Plaintiffs were, on information and belief, entitled under ERISA to participate in at least some of the employee benefit plans sponsored by Defendant NFL.

165.     Defendant NFL misclassified Plaintiffs as independent contractors.

166.     Admissions by certain key NFL administrators—to the effect that the Security Representatives were employees—make it plausible to believe that the NFL misclassified Plaintiffs with full knowledge that Plaintiffs were in fact NFL employees.

167.    Defendant NFL made numerous, repeated misrepresentations to Plaintiffs, every year or two, regarding their employee status, with the purpose of depriving them of employee pension benefits, and engaged in an elaborate scheme to deprive Plaintiffs, and others, of any employee benefits (paras. 97 - 136 *supra*).  Plaintiffs' misclassification is, therefore, a "continuing violation."

168.    Moreover, on information and belief, Defendant NFL, by thus failing to ministerially apply plan eligibility requirements and by changing plan eligibility requirements as to Plaintiffs, assumed responsibility as co-administrators for its benefit plans.

169.    Plaintiffs are entitled to recover benefits due to them under relevant plans and to enforce and clarify rights with respect to relevant plans under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).  Plaintiffs are entitled to damages from Defendants in an amount to be determined at trial, including civil penalties and costs and attorneys' fees, pursuant to ERISA §502, 29 US.C. § 1132.

170.    Plaintiffs believe it would be futile to make a demand on Defendant NFL, or any other party, for employee pension benefits, because Defendant NFL has at all times maintained that Plaintiffs are independent contractors and thus ineligible for any employee benefits. Plaintiffs therefore do not enjoy access to any administrative review procedures under any plan.

171.    Plaintiffs intend to obtain from Defendant all available information needed to pursue their claims for pension and/or welfare benefits under ERISA and to proceed with such claims where appropriate.

### Claim 3
### (For Equitable Relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), against all Defendants, by all Plaintiffs)

172.    Plaintiffs repeat and reallege each of the foregoing allegations.

173.    Plaintiffs were at all relevant times employees of the NFL.

174.    As employees of the NFL, Plaintiffs were, on information and belief, entitled under ERISA to participate in at least some of the employee benefit plans sponsored by Defendant NFL.

175.    Defendant NFL misclassified Plaintiffs as independent contractors.

176.    Admissions by certain key NFL administrators—to the effect that the Security Representatives were employees—make it plausible to believe that the NFL misclassified Plaintiffs with full knowledge that Plaintiffs were in fact NFL employees.

177.    Defendant NFL made numerous, repeated misrepresentations to Plaintiffs, every year or two, regarding their employee status, with the purpose of depriving them of employee pension benefits, and engaged in an elaborate scheme to deprive Plaintiffs, and others, of any employee benefits (paras. 97 - 137 *supra*).

178.    On information and belief, Defendant NFL, by thus failing to ministerially apply plan eligibility requirements and by changing plan eligibility requirements as to Plaintiffs, assumed responsibility as co-administrators for its benefit plans.

179.    As a co-administrator of the NFL plans, the Defendant NFL had certain fiduciary duties under ERISA.

180.    Defendant NFL breached its fiduciary duties by its intentional misclassification of Plaintiff Security Representatives, and by its willful misrepresentations and elaborate scheme to deprive the Security Representatives of their employee rights under ERISA.

181.    Under ERISA § 502(a)(3), Plaintiffs thus seek equitable relief, in the form of an accounting, constructive trust, and/or restitution (in amounts to be determined at trial) from all Defendants of pension and/or welfare benefits to which Plaintiffs are entitled, and which are currently in their possession.

**Claim 4**
**(Interference with Right to Employee Benefits under ERISA § 510, 29 U.S.C.**
**§ 1140, against Defendant NFL, by all Plaintiffs)**

182.    Plaintiffs repeat and reallege each of the foregoing allegations.

183.    As employees of the NFL, Plaintiffs were, on information and belief, entitled under ERISA to participate in at least some of the employee benefit plans sponsored by Defendant NFL.

184.    Defendant NFL misclassified Plaintiffs as independent contractors, thereby discriminated against Plaintiffs.

185.    Admissions by certain key NFL administrators—to the effect that the Security Representatives were employees—make it plausible to believe that the NFL misclassified Plaintiffs with full knowledge that Plaintiffs were in fact NFL employees.

186.    Defendant NFL made numerous, repeated misrepresentations to Plaintiffs, every year or two, regarding their employee status, with the purpose of depriving them of employee pension benefits, and with full knowledge that Plaintiffs were in fact NFL employees.

187.    Defendant NFL further engaged in an elaborate scheme to deprive Plaintiffs, and others, of any employee benefits, as set forth in paras. 97 - 136 above.

188.    Defendant NFL, by such conduct, acted intentionally with the purpose of interfering with Plaintiffs rights under ERISA.

189.    For all these reasons, Defendant NFL violated of ERISA § 510, 29 U.S.C. § 1140, for which Plaintiffs seek appropriate relief under 29 U.S.C. § 1132, including civil penalties and costs and attorneys' fees.

**Claim 5**
**(Violation of Family Medical Leave Act, 29 U.S.C.**
**§§ 2601, *et seq*., against Defendant NFL, by**
**Plaintiffs Thomas Alston and Dag Sohlberg)**

190.    Plaintiffs repeat and reallege each of the foregoing allegations.

191.    Plaintiffs are "employees" within the meaning of the FMLA.

192.    Defendant NFL is an "employer" within the meaning of the FMLA.

193.    Defendant NFL misclassified Plaintiffs as independent contractors.

194.    Admissions by certain key NFL administrators—to the effect that the Security Representatives were employees—make it plausible to belief that the NFL misclassified Plaintiffs with full knowledge that Plaintiffs were in fact NFL employees.

195.    Defendant NFL made numerous, repeated misrepresentations to Plaintiffs, every year or two, regarding their employee status, with the purpose of depriving them of employee pension benefits, and engaged in an elaborate scheme to deprive Plaintiffs, and others, of any employee benefits (paras. 97 - 136 *supra*).

196.    In the Spring of 2016, Plaintiff Alston had a serious medical condition, which required him to take a period of leave from work.

197.    In the Spring of 2018, Plaintiff Sohlberg's spouse had a serious medical condition, which also required him to take a period of leave from work.

198.    Because of the intentional misrepresentations of Defendant NFL, Plaintiffs Alston and Sohlberg believed that medical leave was not available to them.

199.    Plaintiff Alston and Sohlberg relied on this misrepresentation and believed they had no choice but to terminate their employment with Defendant NFL, causing damages.

200.    As a result of Defendant's unlawful conduct, Plaintiffs Alston and Sohlberg lost wages, employment benefits, and other compensation to which they were entitled.

201.     Plaintiffs Alston and Sohlberg thus seek damages, liquidated damages, and such other equitable relief as may be appropriate, as well as attorney's fees, expert fees, and costs under 29 U.S.C. § 2617.

202.     Defendant NFL's intentional misclassification of the Security Representatives also constituted an unlawful interference with Plaintiffs' rights, which interference is prohibited by the FMLA, 29 U.S.C. § 2615(a)(1).

## Claim 6
### (Violation of the Ohio Minimum Fair Wage Standards Act, Ohio Rev. Code §§ 4111.01, *et seq.*, against Defendant NFL, by Plaintiff Patrick Foran)

203.     Plaintiffs repeat and reallege each of the foregoing allegations.

204.     At all relevant times, the Defendant NFL was an "employer" under Ohio State Rev. Code § 4111.03.

205.     At all relevant times, Plaintiff Foran was an "employee" of the NFL under Ohio State Rev. Code § 4111.03.

206.     Plaintiff Foran worked as many as 90 hours (or more) per week during times when he worked on Super Bowl games, the NFL Draft, and on other occasions.

207.     Plaintiff Foran was never paid one and one-half times his regular rate of pay when he worked in excess of 40 hours per week for the Defendant NFL.

208.     By failing to pay him one and one-half times his regular rate of pay when he worked in excess of 40 hours per week, the Defendant NFL violated state overtime requirements under Ohio Rev. Code § 4111.03 of the Ohio Minimum Fair Wage Standards Act ("OMFWSA"), Ohio Rev. Code §§ 4111.01 et seq.

209.    Upon information and belief, Defendant NFL also violated its recordkeeping requirements under Ohio Rev. Code § 4111.08 and the prompt payment of wages requirement under Ohio Rev. Code § 4113.15.

210.    As a result of Defendant's unlawful conduct, Plaintiff Foran is entitled to an award of damages in an amount to be determined at trial.

**Claim 7**
**(Violation of the Michigan Compiled Laws, §§ 408.471, *et seq.*, against Defendant NFL, by Plaintiff Thomas Alston)**

211.    Plaintiffs repeat and reallege each of the foregoing allegations.

212.    At all relevant times, Defendant NFL was an "employer" for purposes of Michigan Compiled Laws, § 408.471.

213.    At all relevant times, Plaintiff Alston was an "employee" for purposes of Michigan Compiled Laws, § 408.471.

214.    Plaintiff Alston worked as many as 90 hours (or more) per week during times when he worked on Super Bowl games.

215.    Plaintiff Alston was never paid one and one-half times his regular rate of pay when he worked in excess of 40 hours per week for the defendant NFL.

216.    By failing to pay him one and one-half times his regular rate of pay when he worked in excess of 40 hours per week, the defendant NFL violated state overtime requirements under Michigan Compiled Laws §408.414(a).

217.    Defendant also failed to provide Plaintiff Alston with the required wage statement pursuant to Michigan Compiled Laws § 408.479.

218.    Upon information and belief, Defendant also violated its recordkeeping requirements under Michigan Compiled Laws § 408.479.

219.    As a result of Defendant's unlawful conduct, Plaintiff Alston is entitled to an award of damages in an amount to be determined at trial.

### Claim 8
### (Violation of the Wisconsin Labor Standards Laws Wisc. Stat. §§ 103, *et seq.* against Defendant NFL Plaintiff Michael Armitage)

220.    Plaintiffs repeat and reallege each of the foregoing allegations.

221.    At all relevant times, the defendant NFL was an "employer" under Wisc. Stat. §103.01.

222.    At all relevant times, Plaintiff Armitage was an "employee" of the NFL under Wisc. Stat. § 103.01.

223.    Plaintiff Armitage worked as many as 90 hours (or more) per week during times when he worked on Super Bowl games, Pro Ball games, the NFL Draft, and on other occasions.

224.    Plaintiff Armitage was never paid one and one-half times his regular rate of pay when he worked in excess of 40 hours per week for the Defendant NFL.

225.    By failing to pay him one and one-half times his regular rate of pay when he worked in excess of 40 hours per week, Defendant NFL violated state overtime requirements under Wisc. Stat. § 103.25.

226.    Upon information and belief, Defendant also violated its recordkeeping requirements under Wisc. Stat. §104.09.

227.    As a result of Defendant's unlawful conduct, Plaintiff Alston is entitled to an award of damages in an amount to be determined at trial.

**Claim 9**
**(Violation of Illinois Wage and Hour Laws 820 I.L.C.S**
**105, *et seq*., against Defendant, NFL by Plaintiff Joseph**
**Doorley)**

228.     Plaintiffs repeat and reallege each of the foregoing allegations.

229.     At all relevant times, the Defendant NFL was an "employer" under 820 I.L.C.S.

105/3.

230.     At all relevant times, Plaintiff Doorley was an "employee" of the NFL under 820

I.L.C.S. 105/3.

231.     Upon information and belief, Defendant NFL violated its recordkeeping

requirements under 820 I.L.C.S. 105/8.

232.     As a result of Defendant's unlawful conduct, Plaintiff Doorley is entitled to an

award of damages in an amount to be determined at trial.

**Claim 10**
**(Violation of the Missouri Labor Laws, MO Rev. Stat.**
**§§ 290.010, *et seq*., against Defendant NFL, by Plaintiff**
**Thomas Malecek)**

233.     Plaintiffs repeat and reallege each of the foregoing allegations.

234.     At all relevant times, the defendant NFL was an "employer" under MO Rev. Stat.

§285.500.

235.     At all relevant times, Plaintiff Malecek was an "employee" of the NFL under MO

Rev. Stat. §285.500.

236.     Plaintiff Malecek worked as many as 90 hours (or more) per week during times

when he worked on NFL Events.

237.     Plaintiff Malecek was never paid one and one-half times his regular rate of pay

when he worked in excess of 40 hours per week for the defendant NFL.

238.     By failing to pay him one and one-half times his regular rate of pay when he worked in excess of 40 hours per week, Defendant NFL violated state overtime requirements under MO Rev. Stat. §§ 290.505 & 290.527.

239.     Upon information and belief, Defendant also violated state law by misclassifying its recordkeeping requirements under MO Rev. Stat. 290.520 and its obligation to provide Plaintiff with the required wage statement pursuant to MO Rev. Stat. 290.080.

240.     As a result of Defendant's unlawful conduct, Plaintiff Malecek is entitled to an award of damages in an amount to be determined at trial.

## Claim 11
### (Violation of the Minnesota Fair Labor Standards Act, Minn. Stat. §§ 177.21, *et seq.*, against Defendant NFL, by Plaintiff Dag Sohlberg)

241.     Plaintiffs repeat and reallege each of the foregoing allegations.

242.     At all relevant times, the defendant NFL was an "employer" under Minn. Stat. 177.23.

243.     At all relevant times, Plaintiff Sohlberg was an "employee" of the NFL under Minn. Stat. §177.23.

244.     Plaintiff Sohlberg worked as many as 90 hours (or more) per week during times when he worked on Super Bowl games, Pro Ball games, the NFL Draft, and on other occasions.

245.     Plaintiff Sohlberg was never paid one and one-half times his regular rate of pay when he worked in excess of 40 hours per week for the defendant NFL.

246.     By failing to pay him one and one-half times his regular rate of pay when he worked in excess of 40 hours per week, Defendant NFL violated state overtime requirements under Minn. Stat. § 177.25.

247.    Upon information and belief, Defendant also violated its recordkeeping requirements under Minn. Stat. § 177.30 and its obligation to provide Plaintiff with the required wage statement pursuant to Minn. Stat. § 181.032.

248.    As a result of Defendant's unlawful conduct, Plaintiff Sohlberg is entitled to an award of damages in an amount to be determined at trial.

**Claim 12**
**(Unjust Enrichment against Defendant NFL, by all**
**Plaintiffs)**

249.    Plaintiffs repeat and reallege each of the foregoing allegations.

250.    Plaintiff Security Representatives were at all relevant times common-law employees of Defendant NFL.

251.    By virtue of its misrepresentations and its misclassification of Plaintiffs as independent contractors, the Defendant NFL saved on its federal and state taxes (including federal Social Security and Medicare taxes), on insurance premiums (including the private-investigator insurance Plaintiffs were required to obtain under state laws to perform their jobs), and on other unreimbursed expenses.

252.    Defendant NFL's enrichment was at Plaintiffs' expense, in that Plaintiffs incurred higher costs as a result, and would have benefited in various other ways from Defendant's payment of federal and state taxes, insurance premiums, and other unreimbursed expenses.

253.    By virtue of its misrepresentations and its misclassification of Plaintiffs as independent contractors, the Defendant NFL saved on all costs it would have incurred, in the form of employer contributions, insurance premiums, or other payments, in connection with providing Plaintiff Security Representatives with the employee benefits to which they were entitled.

254.     Defendant NFL's enrichment was at Plaintiffs' expense, in that Plaintiffs were denied employee pension or welfare benefits, any investment gains, insurance reimbursements, and other consequential benefits flowing from such employee benefits, and incurred higher costs by virtue of providing such benefits for themselves.

255.     Defendant NFL's conduct was unlawful and had the purpose of saving the NFL costs and unfairly shifting those costs to Plaintiffs.

256.     Plaintiffs seek an award of the amounts by which Defendant has been enriched unjustly in saved insurance premiums, state and federal taxes, any costs in connection with providing Plaintiff Security Representatives with the employee benefits to which they were entitled, and other unreimbursed costs, or ill-gotten gains by virtue of Defendant's misrepresentations and misclassification of Plaintiffs as independent contractors.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendant:

a.  awarding Plaintiffs damages in an amount to be determined at trial for all benefits to which they were entitled but did not receive as a result of their misclassification as independent contractors, including but not limited to wages and pension-and-welfare benefits, the expected increase in value of any pension benefits as a result of investments over time, and all costs incurred as a result of Plaintiffs' obtaining benefits on their own;

b.  declaring that the practices complained of are unlawful under the FLSA, ERISA, the FMLA, and the Ohio Minimum Fair Wage Standards Act, Ohio Rev. Code §§ 4111.01 *et seq.*, Illinois Wage and Hour Laws 820 I.L.C.S 105, *et seq.*, the Michigan Compiled Laws, §§ 408.471, *et seq.*, Minnesota Fair Labor Standards Act, Minn. Stat. §§ 177.21, *et seq.*, Missouri Labor and Industrial Relations Laws §§ 290.010, *et seq.*, and Wisconsin

Labor Standards Laws Wisc. Stat. §§ 103, *et seq.* and awarding civil penalties as appropriate;

c.  awarding Plaintiffs their actual damages for unpaid wages in an amount to be determined at trial;

d.  awarding Plaintiffs damages for overpayment or underpaid liabilities on their Social Security, Medicare, and any other taxes;

e.   awarding Plaintiffs damages in an amount to be determined at trial for failure to provide medical leave, including back pay, front pay or reinstatement, and lost benefits as appropriate;

f.  awarding Plaintiffs the amounts by which Defendant NFL has been unjustly enriched in in saved insurance premiums, state and federal taxes, and any other unreimbursed costs or ill-gotten gains by virtue of Defendant's misrepresentations and misclassification of Plaintiffs as independent contractors;

g.  awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial;

h.  awarding pre-judgment and post-judgment interest as applicable;

i.  awarding Plaintiffs the expenses incurred in this action, including costs and attorneys' fees;

j.  awarding Plaintiffs the expenses incurred as a result of this action, including payment of services for tax professionals to amend Plaintiffs' federal and state tax filings as necessary; and

k.  all such other and further relief as this Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  November 16, 2018
        Cleveland, Ohio

Respectfully submitted,

THE CHANDRA LAW FIRM LLC


By: /s/ Michael Halberstam
Michael Halberstam

THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 West 6th Street, Suite 400
Cleveland, OH 44113
Phone: (216) 578-1700
Facsimile: (216) 578-1800
E-mail:
Michael.Halberstam@Chandralaw.com